[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10471

_____

D.C. Docket No. 2:11-cr-00097-JES-SPC-8

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOPHANEY HYPPOLITE,
a.k.a. Mike Larry,
a.k.a. Bo,
ERIC BONITA,
a.k.a. Black,
NEHEME DUCTANT,
a.k.a. Lucky,
a.k.a. Waldo,
WILMANE JEAN,
a.k.a. KK,
a.k.a. Kid,
a.k.a. Gumby,
RICK JEAN,
a.k.a. Slim,
a.k.a. Slick,
JUDE SEREME,
a.k.a. Poppie,
a.k.a. P-O,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 25, 2015)

Before TJOFLAT, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Jophaney Hyppolite, Eric Bonita, Neheme Ductant, Wilmane Jean, Rick Jean, and Jude Sereme appeal their convictions and sentences resulting from their conspiracy to sell crack cocaine. We affirm their convictions and sentences, except for a limited remand to resentence Sereme and to correct a clerical error in Bonita's sentence.

## I.    BACKGROUND

A. Defendants' Crack-Cocaine Operation

Sereme and Michael Hester had worked together selling narcotics in Oklahoma. Hester transported the drugs and served as a lookout for Sereme. In 2010, Sereme, his girlfriend, and Hester moved from Oklahoma to Fort Myers, Florida. They occupied an apartment in the Buddyville area of Fort Myers. Sereme, Hester, and Rick Jean sold crack cocaine from this Buddyville apartment. Sereme purchased powder cocaine from Miami, which he used to produce and sell

2

crack cocaine. Sereme and Hester subsequently moved into a residential trailer on Capital Street in the Palmona Park neighborhood of North Fort Myers and began selling crack cocaine there.

New apartments were opened for selling crack cocaine in the Buddyville area. Michael Dupin sold crack cocaine from an apartment on Carmen Avenue; Rick Jean sold crack cocaine from an apartment on Kimble Drive. Wilmane Jean, Ductant, and Hyppolite sold crack cocaine from the Kimble Drive apartment. In August 2010, an undercover officer purchased crack cocaine from Ductant at an apartment on Breeze Drive; Hyppolite had sold crack cocaine from the same apartment.

B. Official Investigation

The Florida Department of Law Enforcement and a Federal Bureau of Investigation ("FBI") task force had been conducting an ongoing investigation into drug trafficking of the Haitian MOB, an organization that traffics illegal narcotics from Miami, Florida, to Fort Myers, Florida. Various investigative techniques were used by the agents and officers conducting the investigation, including confidential informants and cell-site-location technology to trace the cellular telephones of members of the drug-trafficking operation.

On December 7, 2010, the Florida Department of Law Enforcement applied to a Lee County circuit judge and received authorization for cell-site activation

3

locations for cellular telephone number 239-222-5448 ("target telephone"), with service provided by Sprint. The authorized tracking of the target telephone, believed to be used by Sereme, included installation of a pen-register device with enhanced caller identification and a trap-and-trace device for the cellular telephone number. The authorization also required Sprint to provide the longitude and latitude (GPS) location at the request of the investigating agencies. Law enforcement monitored and tracked the movement of the target telephone for twelve days after receiving the court order allowing them to do so in accordance with Fla. Stat. § 934.32.

On December 8, 2010, an investigating agent received cell-cite locations for the target telephone. On December 9, 2010, surveillance was conducted on the Linda Loma area of Fort Myers, because the information indicated Sereme was in that area. Surveillance also showed a red Ford Edge, rented by Marie Pierre of Miami, Florida, was located at 16860 Carmen Avenue.

On December 10, 2010, an FBI agent contacted the Florida Department of Law Enforcement and advised the target telephone had been at a specified Wal-mart in Fort Myers. The Walmart surveillance video showed Sereme getting into a red Ford Edge that appeared to be the vehicle previously identified in the Linda Loma subdivision. Contact with the car-rental agency revealed Marie Pierre had returned the red Ford Edge and thereafter rented a silver Ford Edge.

4

C. December 20, 2010, Traffic Stop

On December 20, 2010, Florida Law Enforcement was advised the target telephone was traveling from Fort Myers to Miami. Later that night, the agent learned the target telephone was returning to Fort Myers. Other law enforcement officers were contacted in an effort to locate the vehicle containing the target telephone to establish probable cause for a traffic stop of the occupants. With a vehicle description and tag number, the sliver Ford Edge was identified at approximately 8:30 p.m. This information was relayed to Lieutenant Hedrick and Detective Kirkby. Lieutenant Hedrick located the suspect car and followed it for approximately one mile and a half from Gladiolus Road to Bass Road in Fort Myers.

The car was stopped by Lieutenant Hedrick near the intersection of Summerlin Road and Bass Road in Fort Myers for speeding, since he had paced it going 58 miles an hour in a 45 mile-per-hour zone, and illegal window tinting, because he was unable to see the occupants or the front dashboard lights. The general vicinity of the car was known through the use of cell-site-locator information used to track the target telephone. As he approached the car, Lieutenant Hedrick detected the odor of marijuana. Driver Johnny Pierre was asked to step out of the car and patted down; he consented to search of the car. Sereme was left in the car for at least two minutes, while Lieutenant Hedrick was

5

the only officer at the scene.  Pierre was with Lieutenant Hedrick, who was questioning him at his patrol car.  Pierre admitted he was speeding, because his minor son in the back seat needed to use a restroom; Pierre also admitted he and Sereme had been smoking marijuana in the car.  Pierre said there might be a couple of marijuana buds in the ashtray or a cup in the center console.  The search of the car, which lasted approximately 27 minutes, and a pat-down search of Sereme revealed no contraband, except residual marijuana ground into the carpet of the passenger compartment.

Lieutenant Hedrick had the car stopped approximately five minutes before Detective Kirkby arrived; he also noticed a heavy smell of marijuana coming from the car.  Detective Kirkby talked with Sereme and asked for the rental agreement, while recording his investigation with a video camera at the end of his flashlight.  He asked Sereme if he had anything on him; Sereme said he did not.  Because no contraband had been found in the car search and pat downs of the two occupants, Detective Kirkby decided to conduct a further search of Sereme, a known cocaine trafficker.

He approached Sereme, who was standing by the side of Lieutenant Hedrick's patrol car.  Detective Kirkby then smelled marijuana coming from Sereme, which confirmed a second search of Sereme, who was asked to put his hands on the back of the patrol car.  The location of the search was not visible from

the roadway, because there were bushes and trees on one side and vehicles on the other side.  Detective Kirkby took care to conduct the search of Sereme out of sight of the minor child.

During his exterior search of Sereme, Detective Kirkby had felt a protrusion in Sereme's buttocks area.  Because Sereme was a large individual wearing tight jeans, Detective Kirkby asked him to unbutton the front of his jeans and to pull them down a little to enable him to search Sereme's waistline area.  Sereme complied.  Using his flashlight to search the front of Sereme's jeans, Detective Kirkby saw a white, powdery substance falling down between his legs.  Detective Kirkby then went behind Sereme and searched his buttocks area by pulling back the waistband of his underwear, which revealed a plastic baggie protruding from between Sereme's buttocks.  At that point, Detective Kirkby released the band of Sereme's underwear, handcuffed him, and read him his *Miranda*[1] rights.

Detective Kirkby then recovered the baggies from Sereme's buttocks by pulling out his waistband without exposing him to anyone.  Although one baggie fell down, Detective Kirkby had to pull out the other two.  Following Sereme's arrest, he was placed in the Lee County Jail.  Subsequent testing revealed the three baggies contained 86 grams of cocaine.

D. Wire Intercepts and Confidential Informants

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

In its investigation of the crack-cocaine conspiracy operating in Fort Myers, the government obtained from the district judge Title III wiretap intercept orders for telephones belonging to Rick Jean and Neheme Ductant. The probable cause to support the applications to authorize interception of wire and electronic communications was provided by three confidential informants as well as physical surveillance, historical drug activity of the subject defendants and others, and criminal history.[2] Information also was provided by intercepted jail calls between Sereme and other members of the conspiracy after Sereme's incarceration following the traffic stop, where cocaine was found on him.

The Lee County Sheriff's Department investigated the Capital Street trailer distribution in July 2010. On three occasions, an informant purchased crack cocaine there from Hester or Aland Genelas. Law enforcement obtained and executed a search warrant for the trailer; Hester and Genelas were arrested. Genelas called Sereme from jail to discuss the arrest and search of the trailer. They also discussed their belief that law enforcement was working with informants. While incarcerated, Sereme made several telephone calls concerning the drug operation to Rick Jean, Wilmane Jean, Hyppolite, and Ductant. Over

---

[2] An application for a wiretap must be supported by the same probable cause required for a search warrant. *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). The probable cause determination is a "practical, common-sense decision" as to whether the "totality of the circumstances" indicate there is probable cause the evidence sought will be obtained. *Id.* The information supporting probable cause should be sufficient enough for a determination the particular telephone number is being used in furtherance of unlawful activity. *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985).

several months following Sereme's arrest, an informant arranged and consummated several crack-cocaine purchases with Rick Jean and Wilmane Jean.

In July 2011, an agent with the Fort Myers FBI obtained authorization to intercept electronic and wire communications involving a telephone number he believed Rick Jean had used. The affidavit in support of the application for authorization to intercept these communications included descriptions of previous drug activity by Sereme and his partners, information from several confidential informants, as well as previous surreptitiously recorded conversations involving Rick Jean. It also mentioned Sereme's traffic stop, arrest, and subsequent jail telephone calls.

Intercepted communications were conversations between Rick Jean and other parties, including Hyppolite, Ductant, and Wilmane Jean, concerning selling crack cocaine, money, and matters related to the crack-cocaine conspiracy. In early August 2011, Rick Jean was arrested and found in possession of approximately 27 grams of cocaine. In August 2011, authorization was obtained to intercept communications involving another telephone number. Those calls included communications concerning crack cocaine, money, and related matters between Wilmane Jean, Ductant, Hyppolite, and other coconspirators.

On September 21, 2011, confidential source Beth Ann Torta participated in the controlled purchase of crack cocaine. She purchased crack cocaine four times:

twice from Dupin at the Carmen Avenue apartment and twice from Fritzco Desir at an apartment on Linda Loma Drive.  Desir, Sereme, Rick Jean, and others cooked crack cocaine together, pooled resources to purchase powder cocaine in Miami, and operated two distribution apartments on Linda Loma Drive.

Desir supplied crack cocaine for Bonita to sell.  On September 27, 2011, Torta made two more controlled purchases of crack cocaine: one from Bonita at the Linda Loma Drive apartment and one from Hyppolite at the Kimble Drive apartment.  Torta was assured the crack cocaine from these two purchases had the same origin.

In October 2011, law enforcement officers executed warrants on several apartments associated with the defendants' crack-cocaine production and sales. They recovered evidence, including digital scales, a firearm, cash, crack cocaine, and equipment for producing crack cocaine.  Bonita was found at one of the Linda Loma Drive apartments and taken into custody.  Hyppolite was found at the Kimble Drive apartment and arrested.  Sereme, Wilmane Jean, and Ductant also were arrested.

In September 2012, Hyppolite, Bonita, Ductant, Wilmane Jean, Rick Jean, and Sereme were charged in a second-superseding, twelve-count indictment with conspiracy to manufacture, possession with intent to distribute, and distribution of 280 grams or more of a substance containing cocaine base, in violation of 21

U.S.C. § 846 (Count One), as well as a number of individual charges for distribution or possession with intent to distribute cocaine or crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Counts Two-Twelve). Following a jury trial, all defendants were convicted and sentenced to imprisonment.[3]  They raise various trial and sentencing issues on appeal.

## II.    DISCUSSION

A. Trial Issues[4]

---

[3] Hyppolite was sentenced to a mandatory-minimum term of life imprisonment for Count One and a concurrent 30-year-imprisonment term for Count Two; Bonita was sentenced to life imprisonment for Count One and a concurrent 30-year-imprisonment term for Count Ten; Ductant was sentenced to an imprisonment term of 292 months for Count One and a concurrent imprisonment term of 240 months for Count Two; Wilmane Jean was sentenced to an imprisonment term of 120 months for each of Counts One and Five to be served concurrently; Rick Jean was sentenced to an imprisonment term of 240 months for each of Counts One, Five, and Eight to be served concurrently; Sereme was sentenced to a mandatory-minimum term of life imprisonment for Count One and a concurrent 30-year-imprisonment term for Count Three.

[4] We address only the trial issues that warrant discussion.  The following arguments raised by defendants regarding trial issues are unavailing and do not merit further commentary, because (1) the evidence was sufficient to establish a single conspiracy, *see United States v. Richardson*, 532 F.3d 1279, 1284-85 (11th Cir. 2008); (2) the district judge did not fail to instruct the jury on multiple conspiracies; (3) the evidence was sufficient to establish the quantity of drugs at issue, and the government did not need to show the particular quantity of drugs attributable to each defendant for purposes of establishing a conspiracy, *see United States v. Curbelo*, 726 F.3d 1260, 1268-71 (11th Cir. 2013), *cert. denied*, __ U.S. __, 134 S. Ct. 962 (2014); (4) the judge did not abuse his discretion in admitting transcripts of recordings of various conversations, including recordings from jail conversations and during controlled purchases, *see United States v. Green*, 40 F.3d 1167, 1173 (11th Cir. 1994); (5) the judge did not commit plain error by failing to provide relief based on the government's use of informants; (6) Bonita failed to show the denial of his motion to sever resulted in specific and compelling prejudice adverse to his defense resulting in fundamental unfairness, *see United States v. Baker*, 432 F.3d 1189, 1236 (11th Cir. 2005); (7) Bonita failed to establish the judge's ruling he lacked standing to join in the motion challenging the wiretaps deprived him of due process; (8) the judge did not err in denying Bonita's motion for judgments of acquittal on Counts One and Ten, since the evidence was sufficient to establish his involvement in the cocaine-base conspiracy and distribution; (9) the judge did not plainly err or abuse his discretion in admitting Exhibit 35 into evidence, because

11

1. *Sereme's Suppression Motion for Cocaine Found on Him*

Sereme argues the district judge erred in denying his motion to suppress the three baggies of cocaine Detective Kirkby recovered during the second search of his person.  He does not challenge the traffic stop, the police order to exit the car, the search of the car, or his first pat-down search.  But he argues the second search of his person lacked adequate legal justification; even if a legal basis for the search existed, he contends it exceeded the permissible scope of a personal search.  Consequently, he maintains the cocaine found on him should have been suppressed, and his subsequent telephone calls made from jail should be suppressed as derivative "'fruit of the poisonous tree.'"  *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 3385 (1984) (quoting *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 268 (1939)).

"'Because rulings on motions to suppress involve mixed questions of fact and law, we review the district court's factual findings for clear error, and its application of the law to the facts *de novo*.'"  *United States v. Jordan*, 635 F.3d

the government established the proper foundation for its admittance; (10) the judge did not abuse his discretion in granting the government's motion in limine, because permitting the questioning of Detective Jennifer Torres regarding an incomplete investigation, of which she was unaware, and which was unrelated to this case, could have provided only marginal evidence on an unrelated matter and created a substantial risk of distracting the jury, as well as undermining an ongoing investigation, *see United States v. Lyons*, 403 F.3d 1248, 1255 (11th Cir. 2005); (11) the judge did not err in denying Rick Jean's motions for judgments of acquittal, since the evidence was sufficient to establish his guilt for conspiracy, the distribution of cocaine base, and the possession of cocaine base with intent to distribute, and Rick Jean failed to demonstrate confusion or misunderstanding on the part of the jury to justify relief.

12

1181, 1185 (11th Cir. 2011) (quoting *United States v. Bervaldi*, 226 F.3d 1256, 1262 (11th Cir. 2000)). All facts are construed in the light most favorable to the prevailing party. *United States v. Smith*, 741 F.3d 1211, 1218 (11th Cir. 2013), *cert. denied*, __ U.S. __, 135 S. Ct. 704 (2014) (citing *Jordan*, 635 F.3d at 1185). "We afford substantial deference to the factfinder's credibility determinations, both explicit and implicit." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (citing *United States v. McPhee*, 336 F.3d 1269, 1275 (11th Cir. 2003)).

Detective Kirkby had probable cause to search Sereme's person for several reasons. Probable cause is an objectively reasonable standard under the totality of circumstances, which "is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998) (citation and internal quotation marks omitted). "Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search." *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (citing *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986)).

Lieutenant Hedrick's stopping the car in which Sereme was riding was not a routine or random traffic stop. For months preceding Sereme's arrest for

13

possession of cocaine, the Lee County Sheriff's Department had been investigating the Fort Myers crack-cocaine-conspiracy participants in which Sereme was a known participant. The officers specifically had been conducting surveillance on Sereme's target telephone pursuant to court authorization to track it and knew it was in that car.

From their collective knowledge, the investigating officers knew the car stopped by Lieutenant Hedrick the night of December 20, 2010, had returned from a round trip to Miami, the source of cocaine used by the conspiracy to make crack cocaine for sale in Fort Myers, and was traveling toward the Linda Loma neighborhood, one of the areas, where the crack-cocaine conspiracy operated. Consequently, they had reason to believe cocaine would be found in the car or on the occupants. When pat downs of the two adult occupants and search of the car had revealed no cocaine, Detective Kirkby needed to ascertain whether Sereme, a known cocaine dealer in Fort Myers, had cocaine on his person. When "there is a fair probability that contraband or evidence of a crime will be found in a particular place" under the totality of circumstances, probable cause for a search exists. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983).

In addition, it is well settled a vehicle may be stopped under the Fourth Amendment, when an officer has "probable cause to believe that a traffic violation [has] occurred." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999);

14

*see United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (holding "a police officer may stop a vehicle 'when there is probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles" (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S. Ct. 1391, 1400 (1979) (alteration and ellipsis omitted)).  In this case, probable cause existed, when the car under surveillance by the Lee County Sherriff's Department was stopped, because of two obvious and admitted traffic violations: speeding and illegally tinted windows.[5]

Both Lieutenant Hedrick and Detective Kirkby smelled a strong odor of marijuana coming from the car.  We have held "the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search." *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982); *see United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana.").  Consequently, Detective Kirkby also had probable cause to perform a warrantless search of Sereme's person, based on the strong odor of marijuana emanating from him that indicated the presence or possession of contraband.

---

[5] We have recognized a traffic stop was supported by probable cause, where an officer believed the window tinting of a vehicle was in violation of Florida legal limits. *United States v. Weaver*, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (citing Fla. Stat. § 316.2953) (unpublished but cited for persuasive value).

Furthermore, "the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred." *Florida v. White*, 526 U.S. 559, 565, 119 S. Ct. 1555, 1559 (1999); *see United States v. Watson*, 423 U.S. 411, 416-17, 96 S. Ct. 820, 824 (1976) (noting "there is nothing in the Court's prior cases indicating that under the Fourth Amendment a warrant is required to make a valid arrest for a felony"). The *Watson* Court explained, when the judgment of Congress "has for so long been to authorize warrantless public arrests on probable cause rather than to encumber criminal prosecutions with endless litigation with respect to the existence of exigent circumstances, whether it was practicable to get a warrant, whether the suspect was about to flee, and the like." 423 U.S. at 423-24, 96 S. Ct. at 828; *see Gates*, 462 U.S. at 243 n.13, 103 S. Ct. at 2335 n.13 ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) (en banc) (recognizing "traffic stops supported by probable cause are arrests, with all the implications that follow from probable cause to believe that an offense has been committed" (citing *Whren v. United States*, 517 U.S. 806, 116 S. Ct. 1769 (1996)). The Seventh Circuit recognized "[the defendant] was placed in custody by the stop of the car in which he was a passenger"; "a person stopped on probable cause may be searched fully." *Childs*, 277 F.3d at 952. Under the circumstances, Detective

16

Kirkby had probable cause to search Sereme on a public roadside to preserve any drugs that may have been secreted on his person, which could have disappeared in transporting him to the station. This may explain the disappearance of the marijuana smoked in the car, which apparently occurred during the time Sereme was left alone in the car before Detective Kirkby arrived.

Because the Lee County Sherriff's Department had focused its investigation on the extensive Fort Myers crack-cocaine conspiracy and Sereme's predominant participation in it, obvious traffic violations for the car being monitored for use by the crack-cocaine conspiracy, and the unmistakable smell of marijuana emanating from the car and Sereme, Detective Kirkby had ample probable cause to perform a full search of Sereme's person.[6] During his search of Sereme, Detective Kirkby found three baggies of cocaine that had been secreted in Sereme's buttocks. The district judge correctly denied Sereme's motion to suppress the cocaine found on him. Consequently, we need not address his derivative argument that his telephone calls made from jail were fruit of the poisonous tree.

---

[6] To the extent Sereme represents he was subjected to a strip search, the video evidence of his second search shows he was not disrobed. *See* Black's Law Dictionary (10th ed. 2014) (defining "strip search" as "[a] search of a suspect whose clothes have been removed, the purpose usu. being to find any contraband the person might be hiding"). Sereme's jeans were not dropped as far as his knees. In her Report and Recommendation ("R&R"), adopted by the district judge, the magistrate judge noted: "Sereme was never asked to remove all of his clothing and he only briefly had his underwear pulled back *after* Det. Kirkby had seen white powder falling between his legs." R & R, Doc. 189 at 24. *Id.* Sereme was a known cocaine dealer in Fort Myers. Detective Kirkby's feeling something protruding from Sereme's buttocks area, and his knowledge from his experience that drug traffickers often hide cocaine baggies in their buttocks augmented his existing probable cause to search Sereme's person, but it was not a strip search.

17

2. *Ductant's Motion to Suppress Wiretap Evidence*

Ductant argues the district judge erred in denying his motion to suppress the interception of wire communications, because the government failed to meet its burden of establishing the necessity for the wiretaps.[7] "A district court's findings of fact in resolving a motion to suppress are reviewed for clear error; the court's application of the law to those facts is reviewed de novo." *United States v. Gordon*, 231 F.3d 750, 753–54 (11th Cir. 2000). In considering the district judge's ruling, we construe the facts in the light most favorable to the prevailing party. *Id.* at 754.

Each application for a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "Based on the application, the district court may grant an ex parte order if it determines that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . .'" *United States v. Alonso*, 740 F.2d 862, 867–68 (11th Cir. 1984) (citing 18 U.S.C. § 2518(3)(c)). "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor

---

[7] Rick Jean and Sereme adopted Ductant's argument challenging the district judge's denial of Ductant's motion to suppress the wiretap evidence.

used when less intrusive techniques will succeed." *United States v. Van Horn*, 789

F.2d 1492, 1496 (11th Cir. 1986).

The government, however, need not show "a comprehensive exhaustion of

all possible techniques." *Id*.  Section 2518 was not intended "to foreclose

electronic surveillance until every other imaginable method of investigation has

been unsuccessfully attempted, but simply to inform the issuing judge of the

difficulties involved in the use of conventional techniques." *Alonso*, 740 F.2d at

868 (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)). [8] "The

partial success of alternative investigative measures . . . does not necessarily render

electronic surveillance unnecessary." *United States v. Perez*, 661 F.3d 568, 581

(11th Cir. 2011).  Electronic surveillance may be used if the government can

"show why alternative measures are inadequate for 'this particular investigation.'"

*Id.* (quoting *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991)).

In this case, the district judge adopted the magistrate judge's Report and

Recommendation in full and denied Ductant's suppression motion.  The magistrate

judge recommended finding the application for the wiretap demonstrated the need

for electronic surveillance.  This recommendation was based on hearing testimony

and affidavits recounting the limitations on the government's use of conventional

---

[8] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit rendered prior
to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

investigative techniques, because it was unlikely these conventional techniques would be helpful in the future.

Significantly, the government's use of confidential informants was limited by the defendants' suspicion that the informants were working with law enforcement. Any information obtained by the informants was predominantly historical and did not provide insight into who was supplying the cocaine, how the proceeds were divided, or how shipments were transported. Other techniques, such as physical surveillance and pole cameras, would not have revealed activities taking place inside the apartments the defendants frequented. Without the use of electronic surveillance, law enforcement would have been unable to ascertain the relationships between the defendants and their roles within the conspiracy. Consequently, the district judge properly determined the government had established necessity.

3. *Bonita's Alleged Sixth Amendment Violation for Juror Dismissal*

Bonita contends dismissal of Juror 8 deprived him of his Sixth Amendment right to a fair trial. "We review a district court's decision to strike a prospective juror for cause for abuse of discretion." *United States v. Brown*, 441 F.3d 1330, 1356 (11th Cir. 2006).

During trial, Juror 8 wrote a note to the judge explaining she recognized two witnesses as patients in the hospital where she worked. In the presence of the

20

parties, the judge questioned Juror 8, who stated she knew about the mental capacity and prescription-medication history of the two witnesses. To determine what sensitive information she knew, the judge interviewed Juror 8 in camera.

Bonita takes issue with the district judge's decision to interview Juror 8 in camera and his determination Juror 8 was unable to serve as an impartial juror.[9] Bonita characterized the discussion concerning the judge's in camera interview: "the District Court Judge was invited to obtain factual information, presumably to be shared with counsel, so that the determination by all concerned could be made as to whether a juror strike for cause" was appropriate. Bonita Reply Br. at 4. He submits there was an implicit understanding the transcripts of that interview would be shared; however, the record reveals no reason to infer such an agreement existed.

Bonita expressly agreed the district judge should interview Juror 8 in camera. ROA at 3646. He joined Ductant and requested that the judge interview the juror in camera to ensure there would be no HIPAA[10] violation. Ductant suggested the judge compare what already was available in discovery to what the juror would reveal. The implication, if any, was the judge would be the sole

---

[9] Ductant adopted Bonita's arguments concerning the dismissal of Juror 8.

[10] One component of HIPAA, the Health Insurance Portability and Accountability Act of 1996, is the preservation of patient privacy by prohibiting the transfer or communication of protected medical information without consent of the patient.

recipient of any additional information Juror 8 presented. The judge, however, made clear he would not share the transcripts of his in camera interview with Juror 8. We find no error in the district judge's conduct.[11]

Bonita also contends Juror 8 provided adequate assurances she would be able to carry out her duties as a juror impartially. Juror 8's initial note to the judge stated she "[did] not think" her prior knowledge would "influence [her] ability to weigh" the evidence. ROA at 3636. When questioned, Juror 8 revealed, regardless of the actual evidence presented, witness testimony consistent with her prior knowledge would make her more likely to believe the witness in other matters, and testimony contrary to her prior knowledge would lead her to assume that witness was untruthful regarding other matters. ROA at 3639-41. This inability to separate her prior knowledge from the facts presented provided adequate grounds to determine she would be unable to perform her duties. *See United States v. Martin*, 749 F.2d 1514, 1518 (11th Cir. 1985) (finding a juror was unfit to serve, when her "expressions of ability to abide by the evidence presented in court were at most qualified"); *cf. United States v. Rhodes*, 177 F.3d 963, 966 (11th Cir. 1999) (determining juror fit to serve despite concerns about her capacity to evaluate the truthfulness of a witness, when she "demonstrated that those [prior]

---

[11] If error were to exist, it was invited, and "it is 'a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party.'" *United States v. Ross*, 131 F.3d 970, 988 (11th Cir. 1997) (quoting *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1530 n.4 (11th Cir. 1985)).

notions would not prevent her from deciding the case solely based on the evidence presented in court" and could ensure any bias was left outside the courtroom).

Juror 8 expressed at best a qualified capacity to evaluate the case on the evidence presented and possessed a stated inability to leave her biases outside the courtroom. The district judge correctly determined Juror 8 would be unable to serve as an impartial juror. The dismissal of Juror 8 was not an abuse of the judge's discretion and did not affect Bonita's rights adversely.

B. Sentencing Issues

1. *Adequacy of Government's Notice to Enhance  Sereme's Sentence*

Sereme was sentenced to a mandatory-minimum term of life imprisonment on Count One and a concurrent maximum-imprisonment term of 30 years on Count Three. He argues the government failed to comply with the strict notice requirements of 21 U.S.C. § 851 for enhancing his sentence to life imprisonment under 21 U.S.C. § 841(b)(1)(A)(iii). He contends the government's timely notice was defective, because it did not list the convictions on which the government intended to rely in enhancing his sentence. He also argues the government's amended notice was untimely, because it did not seek to amend a clerical error.

"We review the adequacy of a section 851 notice *de novo*." *United States v. Ramirez*, 501 F.3d 1237, 1239 (11th Cir. 2007). This notice requirement is jurisdictional; absent strict compliance by the government, the district judge may

23

not impose the enhanced sentence.  *Id*.  (citing *United States v. Thompson*, 473

F.3d 1137, 1144 (11th Cir. 2006)).  Section 851(a)(1) provides, in relevant part:

> No person who stands convicted of an offense under this part shall be
> sentenced to increased punishment by reason of one or more prior
> convictions, unless *before trial*, or before entry of a plea of guilty, the
> United States attorney files an information with the court (and serves
> a copy of such information on the person or counsel for the person)
> stating in writing the previous convictions to be relied upon.

21 U.S.C. § 851(a)(1) (emphasis added).  This notice "allow[s] the defendant to

contest the accuracy of the information" and enables the "defendant to have ample

time to determine whether to enter a plea or go to trial and plan his trial strategy

with full knowledge of the consequences of a potential guilty verdict."  *United

States v. Williams*, 59 F.3d 1180, 1185 (11th Cir. 1995).

Prior to trial, the government filed three notices of intent to use Sereme's

prior convictions to enhance his penalty in this case.  In a sentencing memorandum

and at sentencing, Sereme's counsel argued his 2009 Oklahoma conviction should

be considered part of the same conspiracy and conduct underlying this conviction;

therefore, it was inapplicable for enhancement purposes.  He contended the second

superseding indictment referred to a drug conspiracy which began on or about

2009, thereby overlapping his 2009 Oklahoma conviction.

Sereme's counsel further argued the government's notice of intent to use

prior convictions was defective.  He contended the 2009 Oklahoma offense

initially was for possession of a controlled substance with intent to distribute but

24

later was amended to possession of a controlled drug. Since the notice of intent filed by the government listed a conviction for possession with intent to distribute a controlled drug, defense counsel argued the notice was defective, because it did not show the amendment to simple possession of a controlled drug. The district judge determined the 2009 Oklahoma conviction was unrelated to this case and was eligible to be considered under § 851, because it involved marijuana rather than cocaine.

In April 2013, the government filed an amended notice of intent to use prior convictions to enhance Sereme's penalties. It noted several errors found in the 2009 Oklahoma judgment. These errors included the description of the crime, the relevant statutory sections, as well as a clerical error listing marijuana as the relevant controlled substance, rather than cocaine base. This discovery is supported by Sereme's suspended-felony sentence of four years, since mere possession of marijuana, the stated conviction in the original sentencing judgment, is not a felony in Oklahoma. *See* Okla. Stat. Ann. tit. 63, § 2-402 (B)(2) (1971). Because of these findings, the Oklahoma court entered an amended judgment, which changed the crime of conviction, the statutory section of the crime, and the date of conviction. The additional findings were amended to correct the enhancing information from marijuana to cocaine base.

The government sought to amend its notice of intent to reflect these changes. Because the prior convictions were felony-drug crimes, the government argued Sereme was eligible for enhanced penalties under Counts One  and Three.  Sereme objected to the third-amended notice of intent and contended it was untimely, because it was not filed before trial as required by § 851, and he was not given an opportunity to dispute the accuracy of the judgments.

At the second sentencing proceeding, the district judge expressed two reservations regarding the third-amended complaint: (1) whether the 2009 Oklahoma judgment was final, and (2) whether Sereme's corrected 2009 Oklahoma judgment rendered the notice of intent untimely.  The government argued the clerical errors in the 2009 Oklahoma judgment did not change the nature of the crime for the underlying purposes relevant to a § 851 enhancement, and the amended notice was filed to correct those clerical errors.  Because of the errors in the original Oklahoma judgment, Sereme's counsel argued the government could not have known of the crime of conviction, when the first and second notices of intent were filed, since the amended judgment had not been entered.  Therefore, the government could not ask Sereme to account for a judgment that had been entered days before, well after the filing of the first and second notice, without prejudicially affecting his rights.

The district judge determined the government's § 851 notice was both timely and complied with the demands of due process. Under Oklahoma law, he determined the amendments made to Sereme's 2009 Oklahoma conviction were clerical, done merely to reflect the actual judgment entered against him and did not amount to substantive changes to the judgment. Alternatively, the judge found, even if the amended notice of intent was defective, the existing notices of intent were sufficient despite their inaccuracies. He concluded the original inaccurate notices gave Sereme sufficient information to contest the accuracy of the former convictions and had notified him the government intended to use those prior convictions as the basis for an enhanced penalty.

At final sentencing, the judge proceeded with these factual and legal conclusions. The Sentencing Guidelines range for Sereme's crimes was 360-months-to-life imprisonment, but using the statutory enhancement changed the applicable Guidelines to a minimum of life imprisonment under Count One and 300 months of imprisonment under Count Three. The judge sentenced Sereme to life imprisonment for Count One and 300 months for Count Three, to run concurrently. On appeal, Sereme's counsel contends the government's notices of intent failed to comply with the notice requirements of § 851. He argues Sereme had no reason to contest inaccuracies in the first or second notice of intent, since their accuracy is not his burden. Significantly, while § 851 permits the correction

27

of clerical errors in the notice, it is silent concerning clerical errors in the underlying judgment.  Because the government sought to base Sereme's enhanced penalties on a judgment that was not entered until after trial and sentencing had commenced, whatever notice was provided failed to comply with the demands of § 851.

We have addressed whether a defendant's knowledge of the convictions against him is sufficient to cure defects in the government's notice under § 851. *United States v. Rutherford*, 175 F.3d 899 (11th Cir. 1999).  In *Rutherford*, the government failed to list any prior convictions in its pretrial enhancement motion. *Id*. at 903.  The government argued a contemporaneously filed notice of intent to introduce evidence of prior convictions at trial and a later discovery response that included the relevant convictions cured that defect.  *Id.*  We disagreed and noted: "Most defendants know of their own convictions.  If that knowledge alone was sufficient to trigger the enhancement procedure, no kind of notice intended by Congress would have been required." *Id.* at 904.  Obligating a defendant to compile the relevant information is "inconsistent with strict compliance." *Id.*  We have held, however, that notice is sufficient where the error is merely clerical. *Perez v. United States*, 249 F.3d 1261, 1266-67 (11th Cir. 2001).

When provided the information contained in the government's notices of intent, we must determine whether Sereme could have investigated those crimes,

prepared for trial knowing the government intended to use the crimes against him, or contested the accuracy of the crimes, or whether the notice provided "unambiguously signaled the government's intent to rely upon a specific prior . . . conviction." *Id.* at 1266. In this case, Sereme's counsel would have been unable to find that information, because the notice provided failed to signal specific prior convictions on which it relied.[12] Those convictions were not identifiable until an amended judgment was entered in Oklahoma, after Sereme was convicted of this crack-cocaine conspiracy. Instead of admitting to actual notice, Sereme alleges confusion about the nature of the conviction, which was shared by the district judge at sentencing: "The Court is not satisfied that the record at this point accurately establishes the convictions for which defendant was convicted in Oklahoma." ROA at 5988.

In addition, the lack of clarity concerning the crimes with which Sereme had been charged in Oklahoma, which persisted to sentencing, shows the inadequacy of the notice provided by the government. Sereme's knowledge he had been charged with a drug crime in Oklahoma, and his use of that knowledge at the various stages of the trial, does not alleviate the government's burden to comply with the strict

---

[12] Without reaching the question of whether Sereme's conviction in Oklahoma was final, we note the amendments entered by the Oklahoma court included a change to the crime of conviction, the applicable statutory section, and the date of conviction. ROA at 6004-11.

notice requirements of § 851.[13]  Sereme may not have had reason to investigate or challenge the crimes listed in the government's initial notices, because the crime charged, possession of marijuana, is not a felony in Oklahoma.  The government's notices of intent were accurate as to case number and jurisdiction but inaccurate and thereby defective regarding the substantive nature of the crimes.

Therefore, the government failed to satisfy the notice requirements of § 851, which precluded the district judge from imposing a mandatory-life sentence of imprisonment under 21 U.S.C §§ 841(b)(1)(A)(iii) and 851.  The judge erred in finding the government's notices of intent to enhance Sereme's sentence were timely and compliant with the requirements of § 851.  We vacate and remand for resentencing, because the judge lacked authority to enhance Sereme's sentence under § 841.

2. *Adequacy of Government's Notice to Enhance  Hyppolite's Sentence*

---

[13] *Cf. United States v. Steen*, 55 F.3d 1022, 1025 (5th Cir. 1995).  In *Steen*, the Fifth Circuit had to determine whether the government's notice was defective when, in addition to clerical errors, it misstated the nature of the crime with which the defendant had been charged, confusing possession and delivery of a controlled substance.  *Id*.  In that case, the court observed "[p]ractical rather than technical considerations govern" the question of whether notice was sufficient.  *Id*. at 1026 (quoting *United States v. Chappell*, 6 F.3d 1095, 1099 (5th Cir. 1993)).  The Fifth Circuit determined, where the defendant "admitted that he had notice of the prior convictions before trial, and that the incorrect description of [his conviction] did not mislead him," notice was sufficient.  *Id*. at 1028.  *Steen* presents a different result than we reach in this case, but the reasoning is consistent.  Importantly, the primary issue in *Steen* was one of misidentification by the government, but the underlying crime remained the same.  In this case, the crime for which the government sought to provide notice and the crime, which ultimately was used to enhance Sereme's sentence, were substantially different.  The errors in the notice of intent in this case could have misled Sereme.

30

Hyppolite was sentenced to a mandatory-minimum term of life imprisonment for Count One and a concurrent 30-year term of imprisonment for Count Two.  He contends (1) the government's § 851 notice was defective, misleading, and unconstitutional, and (2) the record does not show he was served with § 851 notice.  Hyppolite also argues the district judge clearly erred in imposing a two-level enhancement for maintaining a premises for the manufacture or distribution of controlled substances under U.S.S.G. § 2B1.1(b)(12) and a three-level role enhancement for being a manager or supervisor of criminal activity under § 3B1.1(b).

We review de novo the adequacy of § 851 notice, *Ramirez*, 501 F.3d at 1239, and the legality of a criminal sentence, *United States v. Prouty*, 303 F.3d 1249, 1251 (11th Cir. 2002).  We apply de novo review "when determining whether a defendant's sentence violated *Apprendi*[14] by exceeding the prescribed statutory maximum." *United States v. Candelario*, 240 F.3d 1300, 1306 (11th Cir. 2001).  *Apprendi* established that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63 (2000).

---

[14] *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000).

31

Unlike the circumstances surrounding his coconspirator, Sereme, the errors in the government's notice of intent concerning Hyppolite and the proceedings surrounding the convictions referenced in the notice do not so frustrate the purpose behind the notice requirement that it amounts to insufficient notice. *See Ramirez*, 501 F.3d at 1239. The notice signaled the government's intent to use particular convictions, correctly identified by case number, date of conviction, and type of crime, which enabled Hyppolite to plan his defense regarding those convictions. *Id*. The minor errors in the notice—listing an incorrect county and circuit court where a conviction occurred—did not prevent Hyppolite from knowing which convictions were concerned so he could contest the use of them. *See Perez*, 249 F.3d at 1265; *see also* discussion *supra* Part II.B.1. The district judge did not err in determining the government's § 851 notice was adequate.

Hyppolite's other arguments are reviewed for plain error, because he raises them for the first time on appeal. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002). To demonstrate plain error, Hyppolite must show an error that was plain impacted his substantial rights and seriously affected the fairness of the judicial proceedings. *United States v. Schultz*, 565 F.3d 1353, 1356-57 (11th Cir. 2009). "An error is not plain unless it is contrary to explicit statutory provisions or to on-point precedent in this Court or the Supreme Court." *Id*. at 1357 (citing *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003)). For the

32

first time on appeal, Hyppolite argues the record is silent regarding whether he was served with § 851 notice, but he fails to cite any binding authority establishing service must occur. Moreover, the record shows the government filed notice electronically in compliance with the applicable local rules. *See* M.D. Fla. R. 1.01(a); M.D. Fla. Admin. Proc. I(A), I(D)(1).

Hyppolite contends the district judge erred by failing to advise him he was facing a mandatory-life-imprisonment sentence, and the judge should have submitted his prior convictions and the drug quantities at issue to the jury. Hyppolite's unpreserved attacks on his conviction and sentence fail under the plain-error standard, because he neither cites any binding case law nor states errors that affect his substantive rights. *Schultz*, 565 F.3d at 1357 (noting error is not plain unless it is contrary to explicit statutory provisions or binding precedent); *see United States v. McKinley*, 732 F.3d 1291, 1297 (11th Cir. 2013) (recognizing, even if error is plain, a defendant may not be entitled to relief if the evidence of a statutory element of an crime is "overwhelming and uncontroverted," as in this case).

Hyppolite's counsel argues the district judge erred in imposing a two-level enhancement for maintaining a premises for the manufacturing and distribution of a controlled substance under U.S.S.G. § 2B1.1(b)(2). He alleges the judge erred in assigning a three-level enhancement for being a manager of criminal activity under

§ 3B1.1(b).  But Hyppolite abandoned these issues on appeal.  His brief recitation of facts and the absence of cited authority do not suffice to preserve the issue.  "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014); *see also Singh v. U.S. Att'y Gen.*, 561 F.3d 1275, 1278 (11th Cir. 2009) (determining appellant's arguments must contain "citations to the authorities and parts of the record on which the appellant relies," and "simply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes our considering the issue on appeal").

"[W]e review the district court's factual findings for clear error, we review de novo its application of the law to those facts, including its interpretation and application of the U.S. Sentencing Guidelines."  *United States v. Johnson*, 694 F.3d 1192, 1195 (11th Cir. 2012).  The government presented evidence Hyppolite spent substantial time at and exercised control over an apartment used for the manufacture and distribution of crack cocaine.  It also presented evidence Hyppolite supervised at least one participant in the conspiracy.  Any possible error was harmless, because Hyppolite's base-offense level would have been the same with his career-offender enhancement and would have resulted in a mandatory-minimum-life-imprisonment sentence.

34

3. *Bonita's Challenge to His Life-Imprisonment Sentence*

Bonita argues the district judge erred in sentencing him to a mandatory-minimum term of life imprisonment.[15] He contends the judge's oral pronouncement of a mandatory-life sentence, referencing § 841 (b)(1)(C), conflicts with the written sentence, citing § 841(b)(1)(A)(iii), and exposes the judge's intent to sentence him under 21 U.S.C. § 841 (b)(1)(C), which provides a maximum-imprisonment sentence of 30 years, not life imprisonment. Bonita alleges the judge's imposing 10 years of supervised release further evidences this intent and error in his sentencing judgment.

"Where there is a discrepancy between the orally imposed sentence and the written order of judgment and committal, the oral sentence controls." *United States v. Khoury*, 901 F.2d 975, 977 (11th Cir. 1990). "If the oral sentence is ambiguous, then, in an attempt to discern the intent of the district court at the time it imposed sentence, the reviewing court may consider extrinsic evidence,

---

[15] In Bonita's presentence investigation report, the probation office assessed his base-offense level to be 34 under U.S.S.G. § 2D1.1(c)(3) for his involvement with at least 840 grams but less than 2.8 kilograms of cocaine base, plus two levels under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon, for a total offense level of 36. At sentencing, the judge reduced Bonita's base-offense level to 32, because of his involvement with more than 280 grams but less than 840 grams of crack cocaine. As a career offender, however, Bonita had a total-enhanced-offense level of 37. With a criminal history category of VI, Bonita had a Sentencing Guidelines range of 360 months to life imprisonment. Because the government had filed a timely notice under 21 U.S.C. § 851, Bonita confronted a mandatory-life sentence on Count One, which supplanted his otherwise-applicable Guidelines range. *See* U.S.S.G. § 5G1.1(b); 21 U.S.C. § 841(b)(1)(A)(iii). His sentence on Count Ten was capped at a 30-year statutory maximum. *See* 21 U.S.C. §§ 841(b)(1)(C), 851.

including the commitment order." *Id.* "The district court is master of a sentence; the district court's intention controls." *United States v. Kindrick*, 576 F.2d 675, 677 (5th Cir. 1978).

Bonita correctly notes a discrepancy in the district judge's oral sentencing and the sentencing judgment. But this inconsistency resolves in favor of the judge's intent to sentence him to life imprisonment under § 841(b)(1)(A)(iii). A sentence under § 841(b)(1)(A)(iii) comports with the written judgment, and the district judge made clear at the commencement of the sentencing proceeding that Bonita had been found guilty on Count One in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(iii), and 851. The government provided adequate notice showing its intent to seek an enhanced sentence, and the judge found Bonita had been convicted of two prior qualifying crimes. Even if we found this conflict created such ambiguity that it resisted interpretation, the oral pronouncement could not control, because imposing a life-imprisonment sentence under § 841(b)(1)(C) directly conflicts with the law. *See United States v. Joseph*, 743 F.3d 1350, 1353 (11th Cir. 2014).

The judge correctly stated at the beginning of the sentencing proceeding the provision under which Bonita was being charged, carefully evaluated the prior crimes serving to enhance Bonita's sentence, sentenced Bonita to the correct term of life imprisonment after those enhancements, and recognized that this sentence

36

was required under § 841(b)(1)(A)(iii).  These factors evidence a clear intent to sentence Bonita to life imprisonment under § 841(b)(1)(A)(iii).  We remand for the limited purpose of correcting the written judgment, because it incorrectly states Bonita received a 30-year sentence as to Count Eleven, when he was convicted under Count Ten, and the judge's stated intent was to sentence him to life imprisonment under § 841(b)(1)(A)(iii).  *See United States v. Wimbush*, 103 F.3d 968, 970 (11th Cir. 1997).[16]

### AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

[16] Bonita's other sentencing issues are meritless.  He argues the district judge erred by basing his sentence on crimes relating to cocaine base instead of cocaine and alleges there was ambiguity concerning the nature of the drug involved.  The district judge properly calculated the Sentencing Guidelines range and applied § 2D1.1(c)(4) of the Guidelines, based on the quantity of cocaine base involved in his crime.  Bonita failed to show the judge inappropriately sentenced him for crimes related to cocaine base rather than cocaine and did not demonstrate he was entitled to relief on this argument.  Similarly, the judge did not err or abuse his discretion in sentencing Ductant, because he had made proper determinations regarding the character of Ductant's crime, his criminal history, and had considered mitigating factors.